The first case on file is 2-080-10193, the Northern Trust company et al. v. Burandt & Armbrust et al. Arguing on behalf of the accountant is James Portsman, and arguing on behalf of the MFA is T.J. Clay-Thompson. Good morning, counsel. I'm sorry for the late start. We appreciate your being on time with the terrible weather we have, so thank you very much. Mr. Horsman? Yes, ma'am. Good morning. May it please the court, counsel, my name is Jim Horsman. I represent the defendant, Dr. Stephen Armbrust. This is a sad and unfortunate case in many respects, not the least of which is that my client, Dr. Armbrust, was forced to go to trial stripped of his principal causation defense in the case. He figuratively went to trial with one arm tied behind his back. The main part of his defense he was not allowed to present. The result was that a net $7.4 million judgment was entered against Dr. Armbrust. Now, plaintiff's causation theory in the case was that acts and omissions of Dr. Armbrust at or around the time of the birth caused the child to be deprived of oxygen, suffer brain injury, and subsequently develop cerebral palsy. On the other side, Dr. Armbrust's causation theory was that the child's injuries were caused by an infection in the child and the mother before they ever went to the hospital. And nobody ever claimed that Dr. Armbrust was responsible for causing the infection. Counsel, you wrote on page 21 that the standard of review is abuse of discretion. And the sentence immediately before the word standard of review, you said this erroneous ruling effectively granted a directed verdict in plaintiff's favor. Is abuse of discretion a standard of review for a directed verdict? The issue is really, we are arguing it on the abuse of discretion standard, the evidentiary rulings of the court. So we're not supposed to do this under de novo review? There's a part of the appeal that the court should be looking at in the de novo vein, and that's the Frye issue. And that's something that's discussed in plaintiff's brief. But with respect to the evidentiary ruling here, ruling is plural, we're talking about purely an abuse of discretion standard. The case went to trial. On the Frye issue, in your brief, are you saying that, or it seems that you're arguing that once the trial court found that Frye was met, that that ended the discussion, and that we don't really look at tying the theory back to the facts of the case? If something is not based on the facts of the case, a theory that is accepted is not based on the facts of the case, isn't it speculative and irrelevant to the case itself? I think it would be. And that's the point of us discussing in recommitment of Sandry. This court's 2006 opinion is to get to precisely that point. Once you establish the compliance with Frye, then you still, as this court said in Sandry, you still have to look to see whether there's a reasonable basis for the application of those principles to the facts of the case. And is that a very stringent test or not? This court's opinion said it's an extremely low bar, a low, easy standard to meet. The court said in Sandry, our analysis appears to be limited to whether there is some rational basis, not necessarily a correct basis for an expert to rely upon it, guided largely by common sense. So it's not a tough standard, according to what this court found in Sandry. The case goes to the jury here with plaintiff being able to present the jury with plaintiff's causation theory, with Dr. Armbrust not being allowed to tell the jury anything about his theory of causation, that is, what actually caused the injuries to the child. It was devastating to his case. Dr. Armbrust had six experts who were going to support his theory of causation. None of them were allowed to testify. Now, going to this point discussed by Sandry, it seems like there's not much question but that Donaldson provides most of the law here to guide the court's analysis. Donaldson says we don't follow Daubert. We don't follow Fry versus reliability. We simply follow Fry. In the focus, I think, of the court's questions now are focused on the Sandry aspect of the case. What do we look at? What's in the record here? The trial judge formulated the issue as being, is there support, sufficient support for the defendant's causation theory? And Judge Webster focused this even further down to whether the theory, whether the presence of the strep infection had to be or was confirmed by more than one blood test. The judge saw the materials before her. She concluded that there was not a blood culture, there was not more than one blood culture to confirm the existence of the strep. And on that basis, she found that the whole defense theory was speculative. Well, on the most basic level, the surface, it wasn't true that all of the experts agreed that more than one blood culture was required to confirm the existence of the strep infection. Did they all agree that more than one was required to establish the lack of bacteria in the blood? I believe not. Did anybody agree that it took at least two to prove anything or establish anything? Plaintiff's experts held that it required at least two. Dr. Corsino for the defense... Was that to establish the positive nature of the existence of the bacteria? Or did they go on further and say there has to be two to prove that there was no bacteria? I'm not sure that I'm getting the sense of it. The point is that how many times do you have to look outside to see whether it's raining or not? If you look outside once and it's not raining, you can't really say that it hasn't rained today unless you look out again before the day is over. But if you look outside and you see that it's raining when you look outside the first time, it's safe to say that it rained today. So the point is that it depends on what you're attempting to prove that determines how many tests within the window of your statement is going to be as to whether or not it's been established, at least with a reasonable degree of medical or scientific certainty. Dr. Corsino for the defense testified that you could confirm the presence of the strep with one test. The fact that a second test that was taken after the patient gets an antibiotic, the fact that a second test doesn't show anything, Dr. Corsino said, is not surprising. Well, that shows you one of two things, actually. It shows that either the antibiotic worked and the bacteria was killed, or it means that the bacteria was not there at the present time and it may not have been the antibiotic. It may have been a false read the first time. Could be. There are a lot of alternatives that can arise that you can conclude based upon the second test. Yes. Yes, alternative inferences can be drawn from that single element. Plaintiff's argument seems to be that unless there's any single test or element that 100% shows whether or not there was a bacterial infection, that that renders the whole theory speculative. And that's not the case. We focused a lot, the trial judge focused exclusively on this question of the second blood culture. But what was lost in all of that was that the blood culture was just one of about a dozen separate evidentiary items that supported the defense causation theory. It's not simply, as Your Honor, Justice McClaren points out, it may be that alternative inferences can be drawn by the non-presence of bacteria in the second blood culture. But we have much, much more than that to support the defense causation theory. And these, of course, are in our brief, but the defense had, in support of the causation theory, a positive blood culture taken one hour after the child was born. We had bacteria consistent with group beta strep found on the fetal membranes covering the placenta, the placenta, and the amniotic cavity. We had inflammation of the umbilical cord, which was said to show an ascending infection. We had maternal fever. We had the child's depressed state at birth, seizures, evidence of inflammatory reaction, and swipe blood cell ratios. Counsel, but for all of these, and I know your list is longer than that, aren't there other causes than infection for these findings? The maternal fever, couldn't that be caused by the epidural that was administered? Yes. Any of these items, certainly, any one of these, and there are a dozen, and I won't throw in the brief, any one of them are susceptible of arguably different inferences. No one in itself is going to be sufficient to make the point for the defendants. Our point is that under Sandry, take all of these together, and they do give rise to a fair inference in support of the defense theory of causation. Plaintiff has done a good job and certainly has a right to pick at them individually, but collectively, they do represent a reasonable basis, reasonable factual evidentiary basis to support the defense causation theory. But it is certainly true. You focus on any individual one, and you can say, well, that fever, that could mean this, that could mean that, and they're all really that way. But that's not so different than anything else we ever see in court. Very rarely do you have a silver bullet, something that's unequivocally supporting one position and not another. Can I clarify or try to clarify your causation theory? Counsel's argument, your opponent's counsel's argument at the hearing seemed to say that the court could, if it wanted to, look at these three things differently or separately or look at them together. One is meningitis, the other is bacterial sepsis, and then the other is this cascade of cytokines, if I'm pronouncing that correctly. Are these things mutually exclusive? Are they together? What is your theory? What is your causation theory as it relates to these three separate items that are contained within various opinions of the doc? I think they're all supportive of the general theory that it's infection gave rise to a reaction in the child's body that then produced the injury. Is meningitis separate from sepsis or is it altogether? I'll leave that one to Mr. Habeis, and that's a little outside of my scope as well. Well, because there was a test that showed no growth from the spinal fluid. That would be a test for meningitis specifically, correct? Yes. Okay, and that showed no meningitis in this, correct? Where is it in the record that there's anything in the record? We did talk about sandry and how there has to be at least some rational basis in the record to support the meningitis theory. What's in the record to support that theory if we take that just separate? Separate from the more general infection? I don't have a site for that. But it's meningitis is one form of infection. We had infection throughout the child's, not throughout, infection in the child's body and in the mother's body aside from the spinal fluid. In this cascade of cytokines theory, that refers to if in fact the child isn't even infected with the bacteria, that these cytokines through the mother's infection could cause this problem, correct? Cytokines being a reaction of the body to the infection. To the mother's infection though? Just so I'm clear on that. I mean, I know you have your argument that the child was infected. You have a sepsis argument. But assuming that, let's say that one test was a false positive. Let's just say that as an assumption. I mean, is there still literature that this chromoamniocentesis or whatever can cause this cascade of cytokines, even if the child isn't infected per se with the group B strep, could cause this cerebral palsy? Is that what those studies are talking about? I'm just going to have to defer to the record on that. I don't want to misstate it. Our point, frankly, was broader than that. What we rely upon is the collective weight of these dozen or so different bits of evidence supporting the infection theory. The bar is a low one under Sandby. And the trial court put itself in a position that's directly contrary to what Fry and Donaldson and Sandby says that the court should be doing. The trial judge, I urge the court to look at the part of the record that shows the submission of the plaintiff. What was actually given to Judge Webster? Counsel, I'm sorry. Why don't you finish your sentence and then I believe the time is up. I'm not sure our bell has gone off. But you'll have some time on rebuttal, too. I'll finish that sentence simply with a citation of the record. I'm directing the court's attention to what it is the plaintiff submitted to Judge Webster to make their point. And it's in the record at volume 8 beginning with page C1752. The significance of that, I think, for the court is that this is highly technical medical literature that plaintiff has asked the courts to basically stand in the shoes of medical researchers or physicians and make the judgment call on what's the better side of these medical issues. And I think you can hear us generally describe what's there. But to take a look at it, it's very surprising to see the nature of these materials. Thank you. We ask the court to grant adieu. Thank you. All right. And counsel, how do you pronounce your last name, please? It's pronounced Hay-Bison like calling a buffalo. Hay-Bison. And I'm sure you have other issues with that, too, Your Honor. Zinoff? Justice Zinoff? That's right. Okay. Thank you. Your Honors, I want to start out. I think this fits in perfectly with the questions you were just asking, Mr. Horstman. And it goes back to this discussion about the low bar, which is sort of the language in the case. However, the abuse of discretion standard is a very high bar, as Your Honors know. And also, it was mischaracterized in the brief, and it was mischaracterized again. Judge Webster did not exclusively rely on this issue about whether there were two or one blood cultures. And the other thing to clarify about the blood cultures is, also this is unclear from the briefs, but I can clarify this for Your Honors. It's in the record. Dr. Rodetsky, who was one of their experts, testified on pages 6982 to 6983 that what you do is you take two blood cultures at the same time in different sites of the body to make sure you don't have contamination. Dr. Corsino, in her testimony in her evidence deposition, even mentioned the fact that her partner, Dr. Torres, had written in the chart possible contaminant in connection with the culture result they had received. So that's the science of why that was important. But Judge Webster did not base it entirely on that. As Justice Berg pointed out, the cerebral spinal fluid tap was negative, which goes directly to the meningitis. In the absence of that, there was no evidence of meningitis. Dr. Corsino, if you carefully read her entire testimony, is internally contradictory. Her records indicate that she presumed sepsis and treated, which is appropriate, but she never said, based upon a reasonable degree of medical certainty, that one culture proved sepsis. She even said that the clinical signs and symptoms, she couldn't relate any of those to the positive blood culture. And then on top of that, she's contradicted by Dr. Rudetsky in his testimony and the literature, that you have to have the two cultures. And that was all that was presented to the judge. It wasn't some literature says you do and some you don't. That was the only literature that the judge had to exercise her discretion with. But you did have the one positive culture, correct? There's one positive culture. You're arguing with us. I'm kind of sitting here thinking you're arguing to a jury the facts. We do have this one positive culture that's there. If that wasn't there, then it's a totally different issue. But that is in the record, that there's a positive culture, and that they base their least portion of their theory of defense on this positive culture. And whether the medical literature says you should take two, you shouldn't take two, it seems like a question of fact. And why is Judge Webster deciding it's a question of fact? It wasn't a should thing, with all due respect, in the medical literature, and specifically Dr. Rudetsky. The evidence that the court considered before she exercised her discretion was that you have to do two to confirm an infection. But didn't Dr. Corsino say that one would be, there's no such thing as a false positive or something like that? She said that in one part of her testimony, but in other parts she said she was just presuming that it was sepsis, meaning an actual infection. The positive culture only tells you that that sample had bacteria in it. The quantum leap that they want to make from that, which the literature Dr. Rudetsky himself admitted does not match here, is you need a second one to confirm that that positive result you got is truly a sign of infection in this baby versus a contamination, which is a well-known thing. That's a scientific principle. But, and again, the judge did not entirely decide this based on that. She took everything and said there's an insufficient foundation here, and that is an abuse of discretion standard, whether it's a low bar, whether that's a rational basis, it's an abuse of discretion standard. And neither individually nor collectively, with all due respect, was there a sufficient foundation, and she determined that based on her discretion. Isn't proximate cause supposed to be an issue of fact? The trier of fact is supposed to determine it? Absolutely. Ordinarily. Not ordinarily all the time. No, the Supreme Court says ordinarily. I would not disagree that there is no material truth of fact, and as a matter of law or as a question of law, either a direct defining verdict or summary or partial summary judgment should be granted, or maybe even judgment notwithstanding the verdict or the opinion. I don't disagree with anything you say, except this isn't a summary judgment motion. This is an evidentiary issue about the admissibility of evidence, and ordinarily, you know, evidence is admissible if it's relevant. And the judge found that the testimony of the experts were speculative, or was speculation? Based on speculation. No, was speculation. No, if you actually look at what Her Honor said in her ruling, she said the factual basis was too speculative in order to be. What she said and what she did is open for our determination. Certainly. I respect that, Your Honor. You, in your brief, indicate that you believe that the trial court erred when it determined that the Frey test was satisfied. Can you comment on that, please? Yeah, and thank you. And just briefly, the standard, as you know, is de novo. You mentioned that in one of your earlier questions. And with all due respect to Judge Webster, we believe that she achieved the right result for one correct reason, but there was an additional reason upon which you could affirm on a de novo review that if you look at the literature and read a lot of the, and the only literature that was submitted to her, okay, there was only one piece of literature submitted to her by the opposing side. And if you look at that even, de novo, it is not generally accepted, number one, that chorioambionitis, which is this maternal infection, can cause this cascade of cytokines that causes a brain injury. The literature shows that a lot of times those cytokines are actually a good thing, not a bad thing. Secondly, there's no test that can be done to determine they exist. That's in the literature. It's only being done experimentally, this cytokine thing. The literature says this is experimental. And they didn't draw cytokines in this case because they don't do that. That's not used in regular medical practice. And as far as infection in general, a maternal infection causing any kind of brain injury directly or indirectly to a term baby, which Ben indisputably was, that is clearly a matter of, at best, a raging controversy and certainly not generally accepted. We've submitted to your honors, I mean to Judge Webster, an affidavit from Marcus Hermanson, M.D., who's actually published on this, which none of their experts have, summarizing the literature and specifically pointing out that this is not generally accepted for term infants, which he was. And so on that basis, on a denotal review, with all due respect to Judge Webster, that would be an additional basis for your honors to affirm the results you reached for a different reason. It's not refuted. It's just not confirmed, correct, with term babies? There's no literature that refutes these findings. It's just basically they're saying that there isn't enough research out there. I don't know. I guess I could accept putting it that way. But the standard under Frye is generally accepted. The literature does not support a finding that it's generally accepted that this maternal infection, chorioamnionitis, can cause this kind of brain damage in a child's term. And I defer to the record. It's replete. We argued it, you know, to Judge Webster. We argued it in our briefs and cited that. But there's nothing in there that says it's generally accepted. In fact, there's statements clearly of the contrary. So it's based on Donaldson. You're saying it's experimental or of dubious validity? I think that would be a fair characterization. I think the literature clearly supports that. And the literature is objective. It's not people that got hired to come into this case and give opinions that never published on this. This is about as objective as you can get when you go to the medical literature. And, you know, under Donaldson and his progeny, the trial court and this court can go to that in order to reach a determination. That's based on the maternal infection. If this child was septic, is there also a controversy under Frye whether that could cause brain injury? If any human being has actual pathogenic bacteria in their blood, it can cause an infection. And we never disputed that. As you know, on the other grounds, the speculative basis, we were disputing the factual basis for that conclusion to be drawn by an expert. The factual basis being speculative. In this particular case, there was an insufficient factual basis for an expert to conclude that. Right. But I'm just trying to separate these out a little bit. Right. Because you're talking about Frye in the area of this chorioamniocentesis. The maternal infection, indirectly I call it injuring the baby causing cerebral palsy. Okay. That's the Frye issue. That's basically the Frye. But just so I'm clear, if the child was septic or any person is septic, that could cause brain injury, correct, or not? Yes. Okay. That's correct. So that's not really a Frye issue. That's a fact issue. That's a fact issue. As I said, that's how we argued that to Judge Webster and how I believe we argued it to this court. If I understand correctly, you did say that if there's bacteria in the blood and it's pathogenic bacteria, then there can be an infection. And the can goes, you still need other things other than that blood culture. No, where I'm going is to confirm what Justice Burke was asking you. If there is an infection in the bloodstream, is there a reasonable probability that that infection can cause meningitis or inflammation of the brain? I wouldn't go so far as to say reasonable probability. I'd say you can start the discussion then and look at the rest of the evidence. Dr. Radetzky himself, their expert, testified that usually if you find that in the blood, it's called a transient bacteremia and it is not sepsis. That's the usual. And that's their own expert. So it begs the question, with all due respect, I know what you're trying to get at. No, I'm trying to clarify something, Mike. I'm not getting anything. Okay. Well, I hope I've answered your question. It's just I can't go to answer that question and say yes. I was under the impression that if there was bacteria in the blood, then it means that, except under extraordinary circumstances, the bacteria will go throughout the bloodstream, correct? It depends on a lot of things. It depends, number one, whether it's actually in the blood or it's a contaminant that got in the sample before it went to the lab. I'm just trying to... It depends. I'm trying to find out whether or not if I have an ingrown toenail, will I get meningitis? If the infection gets into the bloodstream, will it go from the very end of my toe all the way up to my brain? It can, but it doesn't have to. Okay. That's all I wanted to know. Yes. So the answer is yes, sure. That's what I thought the inference was, but I wanted to confirm. Okay, thank you. Based upon what you said when you said that the pathogenic bacteria, if it's in the bloodstream, can cause an infection. It can. And therefore, it can cause meningitis. It doesn't necessarily, but it can. Right. And it may not cause an infection at all. Right. Your body may be able to fight it off. Right, or a lot of other things. So the other thing I just want to mention briefly, and I don't know if your honors are focused on this at this point, but there were two other grounds upon which the defendants are arguing this should be reversed. One of them is on whether or not there was sufficient evidence that Dr. Armour's negligence caused the injury. And his basic negligence was two things. One was he didn't press the charge nurse with sufficient urgency to get her to call the inter-corps to get into an OR that would have been available. And that's a pure fact question. Nurse Renzius, who they want to talk about it, she said one thing on direct. She said a different thing on cross. On direct, she said, I will do whatever the doctor says. If he says he can't wait, I'll call the inter-corps. The evidence was clear that Dr. Armour's never said, I can't wait. In fact, he said, I can wait. So that's purely a jury question. Well, he used the word now, though, did he not? He said, I need an OR now. But that was followed up with some questions where the question was, you know, she was asked and he was asked. And to combine, this is what the jury could conclude. He said, it can wait, but don't dilly-dally. And then he was specifically asked, did you ever, she was asked, did he ever tell you I can't wait? And she said, no. So the jury could conclude from that evidence that he did not tell her he couldn't wait. She said, if he said, I can't wait, I would have called the inter-corps. The jury had to sort all that out. That's a who he said, she said, you know, credibility question. The other one was on this issue of whether the Pitocin and the continued pushing caused Ben to have this, what's called a crash, and ultimately that's what resulted in his brain injury. We had two experts that testified on that. Both Dr. Kushner, our family practice expert, and Dr. John Elliott, the maternal fetal medicine expert, both testified that that was the physiology of what happened in this case. It was that continued stress on the baby. He couldn't recover in between the contractions. It was caused by the uterine hyperstimulation with the Pitocin running and causing that. And then she's pushing on top of that, and boom, you get your crash. I mean, there was plenty of evidence on that. Can I ask you a couple quick questions? Sure. First of all, you offer proof. You argue that it wasn't made timely. Do you have any case law to say that if it's not made timely, that there's a specific time frame it has to be made? And couldn't the filings that were done in the motion, which were extensive on both sides, stand as the offer of proof? Well, it's an interesting question. And I honestly, the answer to the first part of your question is I defer to our briefs in terms of what we cited in terms of what the law is on the timing or whatever. But this was a little odd, just common sense, talk about common sense. This offer of proof, which, as your honors know from the record, is about this thick, I'm guessing, was not presented to the judge during the trial. It was filed with the clerk's office during jury deliberations. And I think that's more of our argument, although that's certainly not our number one argument in asking for affirmation. Getting the offer of proof, it said, gee whiz, I made a mistake. Bring the jury back in, and we're going to restart the trial. It was already too late. That's my point, is that she had no opportunity to even reconsider it with the presentment of offer of proof. The case was already over. The jury was deliberating. But the thing is the evidence was closed. And there was no during trial, well, Judge, would you take another look at this and give her an opportunity? And that's basically what our argument is. That's kind of a, it may be technically complies with an offer of proof, but in the context of this case, it really didn't serve any purpose except to pad the record and allow that to be in the record for review. And it was already. It was a motion for a new trial, too. It was part of the motion for a new trial. That's true, which is the third time the judge reviewed all this. And then Ms. Frey, you indicated kind of again as an aside in the briefs that the fact that the defendant didn't ask for an actual evidentiary Frey hearing, that maybe that should be somehow construed against the defense, that they should have asked for an evidentiary. I honestly don't recall that we argued that. If we did, I just don't remember. But I don't think we were making that point, because we had no argument with the process. We presented what we presented. They presented what they wanted to present. So that was your Frey hearing. That was the Frey hearing. That was the Frey hearing. It was the hearing on the motion to eliminate. Okay. Thank you, counsel. Thank you, Your Honors. Mr. Horstman. Thank you, Your Honor. With respect to the offer of proof, I think it's important to note, as we point out in our brief, that the judge specifically gave leave to the defense to file whatever offer of proof they wanted. The materials that are in the offer of proof, it was a housekeeping matter. He's right. We gathered them all together and filed them at one time. But if the court looks at what was submitted to Judge Webster as she was deciding this issue as it went along, it essentially was all there before the court. And she specifically, she was advised of what it was all about. She gave defense leave to file whatever they wanted for the housekeeping purpose, making sure the record was complete. On the Frey issue, I think we talked about how the Sandry rule, the reasonable basis is a fairly low hurdle or bar. But also, I think this discussion in court today shows that Frey has to be somewhat limited, too. Everybody here has, obviously, a certain amount of experience with medical malpractice cases. But when we get down to the nitty-gritty of discussing medical theory and research and everything, as lawyers and judges, our ability to deal with that is somewhat limited. The question, the standard is, therefore, the general acceptance test. And a plaintiff makes the argument, well, since there's dispute out there in the medical world as to what the proper view is, that there can't be general acceptance. That's not the model. That's not the basis for Frey. On any given issue, you may have one, two, three, four series methodologies, approaches that have general acceptance. Frey doesn't require unanimous assent by the medical community. He also makes a point or suggests that there needs to be independent witnesses testifying as to what the general acceptance is. That's not true. The defense had six opinion experts who were willing to testify in support of this theory. Plaintiff has demeaned the value of that expert testimony, but there are six experts who are saying this is a recognized, generally accepted approach. I talk in terms of methodology and approach, but really I'm not so sure that this, in the beginning, this was even, the defendant's theory was fairly susceptible to a Frey challenge, because we don't have a novel theory or methodology or technique. We're talking about a conclusion. We're talking about findings of fact. So I think that's a part of this that the plaintiff really hasn't come to terms with. Was it fairly susceptible to a Frey challenge in the beginning? I think there's also a big question as to where the burden lies here. It was, after all, the plaintiff's motion in limiting. It was plaintiff seeking to exclude this testimony. Did the defense have some burden under Frey? Absolutely. It had the burden to establish on a prima facie basis general acceptance, and this material was of the type ordinarily relied upon by experts. And the defense satisfied its prima facie burden with the six experts and the admittedly somewhat limited body of literature. But that was the prima facie basis when plaintiff comes in and says, I want you to eviscerate the defense causation theory. Then the plaintiff has a burden to show that there isn't general acceptance. He showed that there was a conflict out there in the medical community, but he did not show that there was no general acceptance. Did the judge make a finding that the underlying facts were speculative or that the conclusions of your experts were speculative, or some combination thereof? It was probably a combination. The judge addressed these issues as things went along. My impression was the thrust of it was that she was saying the underlying basis, the medical data, was speculative. Is that a little bit like saying that I don't think your treatises, Mr. Expert, are sufficient and, therefore, I'm not going to allow you to testify or base an opinion based upon the treatises that you referenced? Well, I think, in part, that's exactly what it was. When the judge rejected Dr. Corsino's testimony that the single blood culture would be sufficient to establish the existence of the infection, the judge found that the weight of medical opinion was to the contrary, and she disregarded Dr. Corsino's opinion on the matter. Getting to this conflict in the medical community, as I ask your opponent this question, is the conflict that the ñ is it just that there isn't enough evidence out there for this infection causation theory, or is there actual conflict? Are there people on the other side of this saying that a maternal infection could never cause a brain injury in a term infant? I believe the thrust of Plano's argument was that there's not affirmative studies that establish this linkage. And then as to each of the dozen or so elements of evidence that we've cited in support of the defense causation theory, they've argued, well, there's another inference that can be drawn from any one of those single elements. And you're saying there are studies that show the link? Yes, we cite in our brief. Okay.  Thank you. At this time, the Court will take the matter under an advise.